UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:14CV-00071

JAMES M. GOTT                                                                    PLAINTIFF

VS.

THE SUN PRODUCTS CORPORATION                                 DEFENDANT

## MEMORANDUM OPINION
## AND ORDER

Plaintiff James M. Gott ("Gott"), a former mechanics supervisor at The Sun Products Corporation ("Sun Products"), claims that he was fired because of his age and sizable medical insurance claims.   Sun Products alleges it terminated Gott because he was dishonest about failing to properly train and supervise a new employee.   Sun Products has filed a motion for summary judgment as to all of Gott's claims (DN 27-1).   Gott has responded (DN 33), and Sun Products has replied (DN 35).   For the reasons explained below, the Court will **grant** Sun Products' motion and dismiss the case.

## I. STATEMENT OF FACTS

### A. Gott's Employment with Sun Products

In 1997, Sun Products, a detergent manufacturing facility, hired Gott to work as a machine operator (DN 32-1, at p. 23).   Three weeks after being hired, Gott was offered a position as a maintenance mechanic (Id.).   A few years later Sun Products promoted Gott to lead mechanic, and shortly after, promoted him to supervisor (DN 33-2, at pp. 25-27).

In 2013, Sun Products hired Bryan Thompson ("Thompson") to be a part of a team implementing culture change at the company (DN 31-1, Thompson Dep at pp. 33-34). Thompson was to focus on problems at the plant such as short-term thinking versus long-term thinking and micro-managing people versus developing people (Id.). Thompson became Gott's immediate supervisor (DN 27-2, at p. 1).

Prior to Thompson's arrival, Gott received a number of satisfactory performance reviews, indicating that he fully met the expectations of his supervisors (DN 33-5, at pp. 1-2; DN 33-6, at p. 2). Thompson, however, did not feel that Gott's focus was aligned with improving operations in the company (DN 27-2, at p. 1). In May of 2013, Thompson began documenting issues he experienced with Gott (DN 31-7). These included Gott blaming others for mistakes, failing to answer e-mails in a timely manner, acting negatively towards his teammates, and passing big jobs off to other shifts (Id.). Thompson met with Gott in an attempt to help him improve deficient areas of his performance (DN 27-2, at p. 1). Thompson and Gott also discussed the possibility of Gott returning to his prior role as lead mechanic because he seemed to prefer being on the floor and working hands on with the mechanics (Id. at p. 2; DN 32-1, at pp. 152-53).

### B. The Incident, the Investigation, and Gott's Termination

In late 2013, Thompson and Gott decided to hire a current Sun Products employee, Jerry Meiergerd ("Meiergerd"), to work as a maintenance mechanic on Gott's team (DN 32-1, at p. 64; DN 31-1, at p. 83; DN 27-2 at p. 2). Meiergerd had helped the maintenance department in the past by occasionally assisting during shutdown periods when the equipment was off (DN 32-1, at p. 69; DN 31-1, at p. 83). Regardless of Meiergerd's previous experience, Thompson decided that he needed to undergo full training just as a new hire would (DN 32-1, at p. 98).

2

Thompson informed Gott that he was responsible for creating a training plan for Meiergerd. Part of this plan was to include Meiergerd shadowing experienced mechanics before working with the machinery on his own (DN 31-1, at pp. 140, 247). By January of 2014, Meiergerd had completed his classroom training and some on the job training (DN 31-5). Gott signed off on Meiergerd's Liquid Maintenance Training Form (DN 31-5). The next month, Meiergerd began working as a mechanic on Gott's team (DN 31-1, at p. 247), where he should have started shadowing senior mechanics Sean Simpson and Charles Medley.

On his third full day with Gott's team, Meiergerd was with Medley working on a line when a call came over the radio requesting Medley's help with a machine breakdown (DN 32-1, at p. 92). Because Medley was already occupied fixing a line, Meiergerd took it upon himself to investigate the problem (Id.).[1] Meiergerd attempted to troubleshoot the repair on his own but failed to execute the required lock-out-tag-out ("LOTO") procedure before beginning (DN 27-1, at p. 2). LOTO procedures mandate that mechanics disable all power sources to a machine by affixing a "tag" to the machine as a warning to other workers that the machine must remain disabled during repairs (Id.). When Meiergerd exited the machine, he placed his hand on a fill cylinder to sturdy himself (Id.). At this point, another production employee trying to assist with the repair partially engaged the machine, pinning Meiergerd's hand and injuring him (Id.; DN 33-12, at p. 3).

Thompson took Meiergerd to the hospital to be examined after the incident (Id.; DN 31-1, at p. 124). Meiergerd was shaken up and could not provide a clear explanation of what caused

---

1 There is some inconsistency with Thompson's version of events and the version that Meiergerd relayed in his affidavit. Meiergerd's affidavit states: "I specifically recall Jimmy Gott telling me to follow Sean [Simpson], but [Simpson] was already called to line 4 regarding a mechanical issue. The issue on line 4 was resolved by the time I arrived there to assist and shadow [Simpson] on the equipment . . . There was then another general call to go back to line 4 but this time Sean was not in the department. Charles Medley may have been in the department, but I recall that I went by myself to line 4 to see what the problem was." (DN 33-12, at p. 2). Regardless of what Simpson and Medley were doing at the time, there is no dispute that Meiergerd went to the broken line on his own to investigate the problem.

the injury (DN 27-2, at p. 2).  After returning from the hospital, Thompson met with Gott to gather information about the incident (Id.).  Gott explained that Meiergerd had attempted to repair the machine himself but failed to adhere to LOTO procedures (Id.).

Gott and two members of the safety department filled out a safety report regarding Meiergerd's injury (Id.; DN 32-1, at p. 79).   The next day, Thompson met with Gott to note deficiencies in the report and assist in making revisions to ensure the report was thorough and complete (Id.).   The parties dispute the facts surrounding the alterations made to the incident report.  Gott claims that Thompson requested he add inaccurate information to the report, including factors such as Meiergerd's "newness on the job" and that Meiergerd "thought [the] light curtain was sufficient" as the causes of the incident (DN at pp. 78-80).  Gott believes these "inaccurate" additions were Thompson's method of avoiding OSHA/KOSH violations (DN 33, at p. 11).

Thompson, however, claims that after finding several gaps in Gott's original report he began working with Donna Rigdon, a member of the human resources team, to perform additional investigation regarding the incident (DN 29, at pp. 1-2).   The evidence from Thompson's investigation is inconsistent as to whether Gott instructed Meiergerd to shadow Medley and Simpson and, relatedly, whether Gott informed Medley and Simpson that Meiergerd would be shadowing them.  According to Thompson, Gott stated that he specifically instructed Meiergerd to shadow Simpson and Medley and that both senior mechanics were aware of this instruction (DN 27-2, at p. 2; DN 31-1, at p. 191; DN 32-1, at p. 91).

Thompson's post-injury investigation reveals otherwise.  Through questioning the senior mechanics, Thompson learned that neither Simpson, nor Medley, was told that Meiergerd was required to shadow them (DN 31-1, at pp. 159, 188, 191, 194).  Thompson also interviewed

Meiergerd during his investigation, and, at that time, Meiergerd corroborated that Gott never told him to shadow Medley and Simpson (Id. at pp. 159-60, 191).[2]  Because of these inconsistencies, Thompson believed that Gott lied to him about Meiergerd's training and about instructing Meiergerd to shadow the senior mechanics (DN 31-1, at p. 233; DN 27-2, at p. 3).

At the investigation's conclusion, Sun Products found that Meiergerd was trained in LOTO procedures but failed to adhere to them on the date of the accident (DN 27-2, at p. 3; DN 29-1).  As a result, Sun Products terminated Meiergerd on March 4, 2014 (Id.; DN 31-6). Shortly after, Sun Products placed Gott on leave while management decided the appropriate discipline regarding his role in Meiergerd's accident (Id.).  Sun Products ultimately terminated Gott on March 11, 2014, based on his failure to follow instructions regarding on-boarding Meiergerd and his attempt to cover up his failures through lying (Id.; DN 29, at p. 2).

### C. Gott's Age and Insurance Benefits

Gott was 59-years-old and making approximately $79,800 when Sun Products terminated him (DN 32-1, at p. 159).  Sun Products hired Daniel Sledge ("Sledge"), a current Sun Products employee, to take over Gott's position (DN 33-4, at p. 2; DN 29, at p. 2).  At the time, Sledge was 50-years-old and making approximately $73,500 (DN 29, at p. 2).  Sun Products hired Kristopher Johnson to take over Sledge's former position.  At hiring, Johnson was making approximately $80,000 (Id.).

While Gott worked for Sun Products, he and his family received health insurance benefits (Id.).  At some point during 2013, Gott's wife was diagnosed with breast cancer and subsequently underwent two surgeries (Id. at p. 55).  Gott only spoke with Wanda Allen, a

---

2 Meiergerd now contradicts his original statements in his affidavit by indicating: "I am absolutely certain that Jimmy Gott specifically instructed me to shadow other team members in the liquid maintenance department" and "[d]uring the investigation as to my accident at Sun Products I told Bryan Thompson and Donna Rigdon that Jimmy Gott told me to shadow other team members in the liquid maintenance department" (DN 33-12, at p. 3).

human resources employee, about his wife's condition (Id. at pp. 58-59).  Neither Thompson, nor

Lisa Timberlake,[3] had knowledge of Gott's wife's substantial insurance claims (DN 27-1 at p. 3;

DN 29, at p. 2).  Timberlake testified that information regarding an employee's insurance claims

"can only be obtained through the benefits department at the corporate office and is not available

to anyone outside of specialized members of the employee benefits department" (DN 29, at p. 2).

Thus, no decision-maker had access to Gott's insurance claim information at his termination

(Id.).

## II. STANDARD OF REVIEW

Under the federal rules, summary judgment is appropriate if the moving party

demonstrates that there is no genuine dispute as to any material fact.  Fed.R.Civ.P. 56(c).  In

reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable

inferences in a light most favorable to the nonmoving party.  *See* Matsushita Elec. Indus. Co.,

Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)

(citation omitted); Dominguez v. Correctional Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

The moving party may meet their burden by demonstrating the absence of evidence

concerning an essential element of the non-movant's claim on which it will bear the burden of

proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986).  Once the moving party satisfies its burden, the nonmoving party must "do more than

simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec.

Indus. Co., 475 U.S. at 586.  The nonmoving party must show sufficient evidence on which the

jury could reasonably find for the nonmoving party.  Dominguez, 555 F.3d at 549.  The

"nonmoving party has an affirmative duty to direct the court's attention to those specific portions

---

3 Lisa Timberlake is a Senior Human Resources Manager at Sun Products (DN 29).

6

of the record upon which it seeks to rely to create a genuine issue of material fact." In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

Gott asserts a number of claims against Sun Products.   At least three of his claims fall under the Kentucky Civil Rights Act (KCRA), KRS Chapter 344: (1) age discrimination; (2) retaliation and discrimination for using medical benefits; and (3) hostile work environment (DN 1-1, at p. 3).  Gott also asserts a claim of wrongful discharge in violation of "Kentucky Public Policy" and a state-law claim of intentional infliction of emotional distress (Id.).  Sun Products believes it is entitled to summary judgment on all of Gott's claims (DN 27-1).  In his Response, Gott focuses only on proving his "primary two claims" of "age discrimination and retaliatory discharge" in violation of public policy (DN 33).

### A.  Age Discrimination

Gott claims that Sun Products discriminated against him based on his age in violation of the KCRA.  Claims brought under the KCRA are "analyzed in the same manner" as claims brought under the federal Age Discrimination in Employment Act ("ADEA").   Allen v. Highlands Hosp. Corp., 545 F.3d 387, 393-94 (6th Cir. 2008) (quoting Williams v. Tyco Elec. Corp., 161 F. App'x 526, 531 n.3 (6th Cir. 2006) (additional citation omitted)).[4]  Under the KCRA, it is an unlawful practice for an employer to discharge any individual because of his or her age, forty and over.  KRS § 344.040(1)(a).

Gott, like any other plaintiff alleging age discrimination under the KCRA or ADEA, has two potential routes to the jury; he may use either direct or circumstantial evidence to establish a

---

4 Because the age Kentucky age discrimination statute is modeled after the Federal law, courts should apply federal case law to KCRA claims.  Harker v. Fed. Land Bank of Louisville, 679 S.W.2d 226, 229 (Ky. 1984).

violation. *See* Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 811 (6th Cir. 2011) (citing Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009)).  Direct evidence "is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999) (internal quotations omitted)).  Circumstantial evidence, alternatively, "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  Provenzano, 663 F.3d at 811 (quoting Wexler, 317 F.3d at 570).  Regardless of whether the plaintiff submits direct or circumstantial evidence, the burden of persuasion remains at all times on the plaintiff to demonstrate "that age was the 'but-for' cause of the employer's adverse action."  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).

Here, Gott relies entirely on circumstantial evidence.  The three step framework, outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), guides the analysis of age discrimination claims based on circumstantial evidence.  Geiger, 579 F.3d at 622.  At the first step, the plaintiff carries the initial burden of establishing a *prima facie* case of age discrimination. McDonnell Douglas, 411 U.S. at 802.  Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some "legitimate, nondiscriminatory reason" for the adverse employment action.  Id.  Third, assuming the defendant establishes a nondiscriminatory reason, the plaintiff then bears the burden of proving the defendant's explanation is pretext designed to mask discrimination.  Id. at 804.

1. *Prima Facie* Case

To establish a *prima facie* case of age discrimination, Gott must show (1) he was a member of a protected class; (2) he was discharged; (3) he was qualified for the position; and (4) he was replaced by a person outside of the protected class.  Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992).  Sun Products concedes that Gott meets the first two elements because he was over 40-years-old when he was terminated from the company.

Sun Products maintains that Gott cannot establish the third and fourth elements of his claim (DN 27-1, at p .12).  As to the third element, Gott claims he was qualified for his position because he previously received "more than satisfactory" performance reviews for several years, including in areas of safety (DN 33, at p. 15).  Gott also points to his quick promotions during his time at Sun Products (Id.).  Sun Products argues that Gott was not qualified because he failed to properly on-board and supervise Meiergerd and lied about these failures after Meiergerd was injured (DN 27-1, at p. 13).  Sun Products also relies on McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990), arguing that Gott was not doing what Sun Products wanted and expected, and therefore, was not doing his job (Id.).

In proving the third element, a plaintiff must only demonstrate that he was objectively qualified for the position by presenting credible evidence that his qualifications "are at least equivalent to the minimum objective criteria for employment in the relevant field."  Wexler, 317 F.3d at 575-76.  The court should consider the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.  Id. at 576.  The court must examine this evidence "independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating [the] plaintiff."  Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 661 (6th Cir. 2000).

Sun Products' argument fails for two reasons.  First, the Court cannot take into account Gott's failure to properly on-board Meiergerd and his subsequent dishonesty during the *prima facie* evaluation because that evidence is used by Sun Products as its nondiscriminatory reason for terminating Gott.[5]  Nor does the <u>McDonald</u> case aid Sun Products in disproving the third element.  In <u>McDonald</u>, the plaintiff conceded that he was not performing at a level which met his employer's legitimate expectations.  898 F.2d at 1160.  Gott, on the other hand, disputes the contention that he was unqualified by producing two performance reviews from recent years, which indicate that he fully met the expectations of his supervisors (DN 33-5, at pp. 1-2; DN 33-6, at p. 2).

Although Thompson documented specific issues with Gott's performance, he also noted Gott's strengths, which included getting work done, being task oriented, moving between departments to work, and having great knowledge of the plant and equipment (DN 31-7).  Thompson also testified that Gott and his team did a satisfactory job of reducing outstanding work orders at the plant (DN 33-7).  Taking these facts in a light most favorable to Gott, he has established a genuine issue of material fact as to whether he was qualified for the position.

Additionally, Sun Products argues that Gott cannot meet his burden in proving the fourth element of his *prima facie* case (DN 27-1, at p. 13).  Sun Products claims that Gott offered no evidence that he was replaced by someone "substantially younger" because he was replaced by a similarly experienced employee who was 50-years-old (DN 27-1, at p. 13).  Gott responds that

---

5 If a district court fails to examine plaintiff's evidence independent of the nondiscriminatory reason produced by the defense for terminating the plaintiff, then the court improperly conflates the distinct stages of the <u>McDonnell Douglas</u> inquiry.  <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 660-61 (6th Cir. 2000).

the nine-year age difference between him and his replacement, Daniel Sledge ("Sledge"), creates a factual issue (DN 33, at p. 17).[6]

In age discrimination cases, the fourth element is modified to require the plaintiff prove that he was replaced by a "significantly younger person" instead of a person outside of the protected class. O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); Blizzard v. Marion Technical Coll., 698 F.3d 275, 283 (6th Cir. 2012); Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003). The Sixth Circuit holds that "an age difference of six years or less between an employee and a replacement is not significant," Grosjean, 349 F.3d at 340, while an age difference of ten years or more generally is considered significant. Id. at 336. As for age discrimination cases in which the replacement is between six and ten years younger than the plaintiff, Grosjean created a "zone of discretion," which requires consideration on a case-by-case basis. Blizzard, 698 F.3d at 284.

Subsequent case law provides examples of such "zone of discretion" determinations. A number of cases hold that age differences falling in the six to ten year zone are significant and satisfy the fourth element for summary judgment purposes. See, e.g., Blizzard, 698 F.3d at 284 (six-and-a-half-year age difference is significant); Rhoades v. Standard Parking Corp., No. 1:11CV2699, 2013 WL 3884179, at *5 (N.D. Ohio July 26, 2013) (nine-year age difference is significant). Other courts have found age differences in the zone of the discretion not to be significant when the plaintiff "presents no evidence, other than the age difference." Scola v. Publix Supermarkets, Inc., 557 F. App'x 458, 467 (6th Cir. 2014) (seven-year age difference,

---

6 Gott also addresses the fact that Kristopher Johnson is twenty-seven-years younger than him in his argument (DN 33, at p. 17). Sun Products hired Johnson to take over Sledge's position after Sledge moved into Gott's position. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties. Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) (citing Sahadi v. Reynolds Chem., 636 F.2d 1116, 1117 (6th Cir. 1980)). Because Sledge moved into Gott's position, he became Gott's replacement. Thus, Johnson's age and experience are irrelevant to Gott's age discrimination claim.

without more, was not significant); <u>Harman v. W. Baptist Hosp.</u>, Civil Action No. 5:12-CV-00159, 2014 WL 3513202, at *7 (W.D. Ky. July 15, 2014) (eight-year-and-eight-month difference, without more, was not significant).

Gott's case is a close call. There is a nine-year age difference between Gott and Sledge, which leans toward the more "significant" end of the "zone of discretion." However, Gott produces no evidence, other than the nine-year age difference, to support his claim. The Court concludes that, although the nine-year age difference between Gott and Sledge "is perhaps not the best evidence to create an inference of age discrimination," <u>Blizzard</u>, 698 F.3d at 284, it is nonetheless sufficient to create an issue of material fact at the summary judgment stage.[7]

### 2. Legitimate Nondiscriminatory Reason and Pretext

Because Gott has stated a *prima facie* case for age discrimination, the burden of production shifts to Sun Products to articulate a legitimate, non-discriminatory reason for terminating Gott. Sun Products claims it terminated Gott because he "failed to properly train and supervise a subordinate who was injured on the job as a result" and lied in an attempt to cover up his culpability (DN 27-1, at p. 1). The Court finds this satisfies the legitimate, nondiscriminatory reason requirement, shifting the burden back to Gott to prove that Sun Products' stated reason for his termination is pretextual.[8]

---

7 Sun Products also argues that Gott fails to establish the fourth element because he offers no evidence that he was treated differently than similarly-situated employees. There are two ways to satisfy the fourth element. If a plaintiff fails to establish that he was "replaced by a non-protected person," he can still make his *prima facie* case by showing, in addition to the first three elements, that "a comparable non-protected person was treated better." <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992). Because these are alternative approaches, and Gott has established his *prima facie* case as to being replaced by a significantly younger person, there is no need to further evaluate Sun Products' "similarly situated employee" claim in this context.

8 Gott claims that he does not have to show the reason for termination was pretextual because he has already established a *prima facie* case that defeats Sun Products' Summary Judgment Motion (DN 33, at p.18). Gott is mistaken. When a plaintiff establishes a *prima facie* case of discrimination, "[t]he burden then *must* shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973) (emphasis added). In turn, the plaintiff "*must . . .* be afforded a fair opportunity to show that [employer's] stated reason for [employee's] rejection was in fact

At the "pretext" step, the plaintiff has the burden to produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him]." Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009).  This can be accomplished by proving that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the employer's action; or (3) the proffered reason was insufficient to motivate the employer's action.   Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008).  This three-part inquiry need not be applied rigidly, however, because "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?"  Blizzard, 698 F.3d at 285 (quoting Chen, 580 F.3d at 400, n.4).

Gott argues that he can prove pretext using all three methods.  First, he claims that Sun Products' reason for his termination is patently false because Meiergerd's affidavit firmly establishes that he was told to shadow Simpson and Medley (DN 33, at p. 19).  Sun Products claims that even if Gott did tell Meiergerd to shadow more senior mechanics, it is still entitled to summary judgment under the "honest belief rule" (DN 27-1, at pp. 18-21; DN 35, at p. 4)

The Sixth Circuit has adopted a "modified honest belief" rule, which states "'for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'"  Escher v. BWXT Y-12, LLC, 627 F.3d 1020, 1030 (6th Cir. 2010) (quoting Wright v. Murray Guard, Inc., 455 F.3d 702, 708 (6th Cir. 2006) (citation omitted)).   If the employer proves that it held an honest belief in its proffered reason, even if the reason is ultimately found to be "mistaken, foolish, trivial, or baseless," the employee cannot establish pretext.  Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285-86 (6th Cir.

---

pretext."  Id. at 804 (emphasis added).  Therefore, if a plaintiff brings a discrimination case using only circumstantial evidence, and the plaintiff establishes its *prima facie* case, the analysis *must* move forward as the burden shifting framework denotes.

2012) (quoting <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 806 (6th Cir. 1998)).  Even so, employers are not automatically shielded by the honest belief rule.  The employee must be provided the opportunity to produce evidence to the contrary, "such as an error on the part of the employer that is 'too obvious to be unintentional.'" <u>Seeger</u>, 681 F.3d at 286 (quoting <u>Smith</u>, 155 F.3d at 807).

After finding gaps in Gott's injury report, Thompson and his team began investigating the events surrounding Meiergerd's injury.   The investigation lasted nearly four weeks and involved multiple interviews.  During Thompson's interviews with the senior mechanics, both Simpson and Medley indicated that Gott did not inform them that Meiergerd would be shadowing them (DN 31-4, at pp. 4, 6).  Thompson also interviewed Meiergerd who, at that time, corroborated that Gott did not instruct him to shadow Simpson and Medley (<u>Id.</u> at p. 6).

Gott submits Meiergerd's affidavit as evidence of pretext, but Meiergerd's affidavit was not before Sun Products at the time it decided to terminate him.  Gott also points to one line in Thompson's handwritten notes from the investigation, which states, "[Meiergerd] approached [Medley] and said I [sic] with you have patience with me" (DN 31-4, at p. 4).  Gott believes this statement creates an inference that Meiergerd was told to shadow Medley.

Unfortunately, a single inferential statement in the ten pages of handwritten notes from Thompson's investigation falls very short of establishing pretext.  Gott has failed to produce evidence demonstrating that Sun Products' reliance on the facts before it at the time of its decision to terminate him was unreasonable.   If Sun Products was incorrect about Gott's dishonesty, it was nothing more than a mistake, which is protected under the honest belief rule. As a result, Gott cannot establish pretext by claiming Sun Products' reason for termination had no basis in fact.

Gott's arguments concerning the second and third methods of proving pretext are intertwined.  Essentially, Gott claims that Meiergerd's LOTO violation did not motivate and was insufficient to motivate Sun Products' decision to terminate Gott because Sun Products had never terminated a supervisor for a subordinate's LOTO violation (DN 33, at pp. 19-20).  Gott believes that Sun Products' past practices with LOTO violations are highly inconsistent, and he points specifically to the "Cecil Marshall case" for comparison (Id. at 21).

Cecil Marshall ("Marshall") was a mechanic at Sun Products, working beneath Daniel Sledge, who severed his finger as a result of failing to follow LOTO procedures (DN 29, at p. 2).  Marshall was terminated after the incident, but Sledge was not (Id.).  Gott claims he is similarly situated to Sledge and that he was punished more severely for Meiergerd's LOTO violation because of his age (DN 33, at p .21).   To be "similarly situated" to Gott, the other employee must have "been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."   Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1991) (citations omitted).

This rules out Sledge as a similarly situated employee.  Sledge engaged in conduct different than Gott.  At the time of Marshall's incident, he was working under Sledge, but was not a trainee or a new hire.  Quite the opposite, Marshall had approximately thirteen years of experience working with the machine that injured him (DN 29, at p. 2).  In contrast, Meiergerd had only been working on Gott's team for three days when he was injured, and Gott was supposed to be supervising Meiergerd shadowing the senior mechanics.  Meiergerd's previous experience with the machinery had occurred during shutdown periods when the machines were

turned off.  Further, Gott's conduct cannot be compared to Sledge's because Sun Products did not find Sledge acted dishonestly in any way.

Gott also admits that after the Cecil Marshall incident, the scrutiny for LOTO violations increased at the plant, and employees were warned not to have any other LOTO issues (DN 33, at p. 7).  Thus, Gott was aware that the plant was more concerned with LOTO violations as a result of Marshall's injury.  Considering this increased awareness, Gott cannot claim that his role in Meiergerd's incident is insufficient to motivate his termination because he puts forth no similarly situated employee from after the Marshall incident.[9]

Gott references the LOTO violations at Sun Products again in claiming that Thompson used Meiergerd's incident as a pretextual opportunity to deflect blame for potential OSHA/KOSH violations at the company (DN 33, at p. 10).  Even if Gott could prove he was terminated because Thompson feared receiving OSHA/KOSH violations, this still fails to establish that Sun Products legitimate nondiscriminatory reason was a pretext for age discrimination.

In a final effort to prove pretext, Gott accuses Thompson of changing the culture at Sun Products by getting rid of the older employees (DN 33, at p. 20).  Meiergerd's affidavit makes similar accusations, claiming that Sun Products was purposely firing older employees (DN 33-12 at p. 3).  Yet Gott admits that nobody ever did anything to make him think his age was an issue (32-1, at p. 121).  Gott also testified he believed he was replaced by a "young 20 year old as a cost savings" (Id. at p. 120); when, actually, Gott's replacement was 50-year-old Daniel Sledge. (DN 29, at p. 2).  The fact that Sledge's former position was filled by a younger new hire,

_____

9 In his Response Gott sets forth a list of LOTO violations that have occurred at Sun Products, claiming that the list proves the "glaring issue of inconsistent disciplinary action" (DN 33, at p. 5-6).  But each of these violations occurred before the Cecil Marshall incident, and thus, was not subject to the increased scrutiny for LOTO violations.

Kristopher Johnson, further disproves Gott's argument because Johnson made more money at his hiring than either Sledge or Gott, resulting in no cost-savings for Sun Products.

In the end, Gott's pretext argument is based entirely on unsupported speculation. *See* Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 623 (6th Cir. 2003) (finding unsupported speculation cannot form the basis for demonstrating pretext). In light of the overwhelming evidence that Sun Products terminated Gott because of its honest belief that he failed to properly train Meiergerd and subsequently lied about it, that speculation is not enough to demonstrate pretext and survive summary judgment.[10]

### B. Retaliatory Discharge in Violation of Public Policy

Gott's Complaint states that his "termination from employment constitutes a wrongful discharge in violation of Kentucky Public Policy" (DN 1-1, at p. 3). It is somewhat unclear from the pleadings which public policy Gott is claiming that Sun Products violated. The only statute Gott cites in his Complaint is the Kentucky Civil Rights Act at KRS § 344.040 and 344.280 (Id. at pp. 3-4).

Now, in his Response, Gott claims that Thompson requested he alter the incident report with false information to prevent the company from receiving OSHA/KOSH violations, and when Gott refused, he was terminated (DN 33, at pp. 10, 22). Gott vaguely cites to 29 U.S.C. § 666 and KRS § 338.991 in referencing his belief that Thompson was trying to prevent OSHA/KOSH violations (DN 33, at p. 10 n. 25). The undersigned assumes Gott meant to cite to 29 U.S.C. § 660(c) and KRS § 338.121(3)(b), the statutes prohibiting retaliation under the federal and Kentucky Occupational Safety and Health Acts.

---

10 *See* Pike v. ABF Freight Sys., Inc., 478 F. App'x 295, 299 (6th Cir. 2012) (finding that the employee's claim that his demotion rested on a single ambiguous prediction was not enough to demonstrate pretext in light of the overwhelming evidence that the employer demoted him because of economic conditions and poor job performance).

Both the OSHA statute and the Kentucky OSHA statute clearly forbid the firing of an employee for filing a complaint with OSHA.   These statutes further specify that any employee "who believes that he has been discharged . . . in violation of this subsection may . . . file a complaint with the commissioner alleging such discrimination."  Benningfield v. Pettit Envtl., Inc., 183 S.W.3d 567, 571 (Ky. Ct. App. 2005) (quoting KRS § 381.121).

Where a statute "both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute."  Grzyb v. Evans, 700 S.W.2d 399, 401 (Ky. 1985).   Courts applying Kentucky law have consistently held that a wrongful discharge claim brought under KRS § 338.121 is preempted because it is based on the same public policy embodied in the statute.  Smith v. Caterpillar, Inc., 304 F. App'x 391, 394 (6th Cir. 2008); Rodgers v. Nestle Prepared Food  Co., Civil Action No. 5:13-60, 2013 WL 3973173, at *4 (E.D. Ky. Aug. 1, 2013); Hines v. Elf Atochem N. Am., Inc., 813 F.Supp. 550, 552 (W.D. Ky. 1993); Benningfield, 183 S.W.3d at 571.   Accordingly, Gott cannot state a separate claim for wrongful discharge based on OSHA.[11]  Smith, 304 F. App'x at 394.

### C.  Gott's Additional Claims

Gott's Complaint asserts three additional claims: (1) hostile work environment; (2) discrimination regarding his use of medical benefits; and (3) intentional infliction of emotional distress (DN 1-1).   However, in his Response, Gott wholly fails to mention, or argue in support of, these claims.

---

[11] The same reasoning applies if Gott was trying to bring his public policy claim under the KCRA because the KCRA specifies the civil remedy available to the aggrieved party.  Parks v. UPS Supply Chain Solutions, Inc., Civil Action No. 11-404-DLB-CJS, 2014 WL 414230, at *14 (E.D.Ky. Feb. 4, 2014) ("several courts have held that wrongful discharge claims based on the Family Medical Leave Act and the Kentucky Civil Rights Act were pre-empted."); Broadway v. Sypris Technologies, Inc., Civil Action No. 3:09-CV-976, 2011 WL 847064, at *4 (W.D. Ky. Mar. 9, 2011) (explaining that the KCRA provides its own cause of action and remedies, thus preempting a public policy violation based on the statute).

18

Several cases have held that a party waives its claims by responding to some, but not all, of the movant's arguments in a motion for summary judgment. *See, e.g.,* Back v. Nestle, USA, Inc., Civil Action No. 08-290-JMH, 2010 WL 7762630, at *2 (E.D. Ky. Aug. 13, 2010) (citing Humphrey v. U.S. Attorney General's Office, 279 F. App'x 328, 331 (6th Cir. 2008); Resnick v. Patton, 258 F. App'x 789, 790-91 n.1 (6th Cir. 2007) (additional citation omitted)).  By contrast, the Sixth Circuit has noted that a non-movant's complete failure to respond to a motion for summary judgment is not alone sufficient grounds for a district court to grant that motion. *See* Carver v. Bunch, 946 F.2d 451, 455 (6th Cir. 1991).

Here, Gott chose to respond to his "two primary claims" but not to the others.  This alone could be grounds to grant Sun Products' motion.  Nevertheless, even if Gott did not waive his claims, they fail as a matter of law.

### 1.  Hostile Work Environment

Gott alleges that Sun Products' actions constitute a hostile work environment under the KCRA (DN 1-1, at p. 3).  Sun Products counters that Gott fails to identify what actions led to a hostile work environment (DN 27-1, at p. 24).  To establish a *prima facie* case for hostile work environment in the age discrimination context, a plaintiff must prove (1) the employee is 40 years or older; (2) the employee was subjected to harassment based on age; (3) the harassment unreasonably interfered with the employee's work performance and created an objectively intimidating, hostile, or offensive work environment.  Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834-35 (6th Cir. 1996).

There is no evidence in the record that any employee at Sun Products harassed Gott based on his age.  Gott admits that nobody at Sun Products ever said anything about his age or treated him badly because of his age (DN 32-1, at pp. 60-61, 121).  When asked "[w]hat about your

work environment was uncomfortable?," Gott responded "[i]t wasn't uncomfortable" (Id. at p.

124).   The only evidence relating to a hostile work environment claim that Gott puts forth is

testimony that he had some difficulty in learning new computer programs (Id.).   Yet Gott

explicitly states that the new computer programs did not produce a difficult environment for him

to perform his job (Id. at 125).   Because the record contains no evidence sufficient to establish a

material issue of fact, summary judgment is appropriate.

### 2.   Discrimination Regarding Gott's Use of Medical Benefits

Gott also alleges that his "termination constitutes retaliation and discrimination in

violation of KRS 344.280" because he and his family have made sizeable claims on the health

insurance provided by Sun Products (DN 1-1, at p. 3).   As a result, Gott believes he was

terminated for exercising his rights under the protected health plan (Id.).   Sun Products counters

that KRS § 344.280 does not apply to Gott's claim and, alternatively, that Gott produces no

evidence of a link between his termination and his sizeable insurance claims (DN 27-1, at pp. 26-

28).

KRS § 344.280 states that it is an unlawful practice to "retaliate or discriminate in any

manner against a person because he has opposed a practice declared unlawful by this chapter, or

because he has made a charge, filed a complaint, testified, assisted, or participated in any manner

in any investigation, proceeding, or hearing under this chapter."   A claim for unlawful retaliation

requires the plaintiff to establish (1) he engaged in a protected activity; (2) he was disadvantaged

by an act of his employer; and (3) there was a causal connection between the activity engaged in

and the employer's act.  Ky. Dep't of Corrections v. McCullough, 123 S.W.3d 130, 133-34 (Ky.

2003) (citations omitted).    Gott's filing of insurance claims does not constitute a "protected

activity" because Gott did not file a claim with the EEOC, participate in an investigation, or

oppose an unlawful practice under the KCRA.  *See* <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561, 578 (6th Cir. 2000).

Even if Gott had engaged in a protected activity, he cannot prove a causal connection between his termination and his sizeable insurance claims.  Although Gott believes he was a liability to the company because his claims totaled around a half million dollars, he admits he has no evidence that his claims impacted the company's policy (DN 32-1, at p. 60).  Gott testified that he mentioned his wife's breast cancer to a human resources employee but never discussed his insurance claims with anyone else at Sun Products (<u>Id.</u> at p. 59).  Thompson and Timberlake testified that they did not know, and had no way of knowing, the size of any medical claims made by Gott's wife or the potential impact of these claims on the company's insurance premiums (DN 27-2, at p. 3; DN 29, at p. 2).  Consequently, no decision-makers had access to information regarding Gott's wife's insurance claims.  This claim fails as a matter of law.

### 3.   Intentional Infliction of Emotional Distress ("IIED")

Finally, Gott's Complaint asserts that Sun Products' actions constitute the tort of IIED, also known as the tort of outrage (DN 1-1, at p. 3).  In opposition, Sun Products claims that Gott's IIED claim is preempted by the KCRA (DN 27-1, at p. 28).

Sun Products is correct that the KCRA subsumes IIED claims against employers.  <u>Hanley v. Chevy Chaser Magazine, LLC</u>, 199 F. App'x 425, 432 (6th Cir. 2006); <u>Webb v. Humana Inc.</u>, 819 F.Supp.2d 641, 651 (W.D. Ky. 2011).  It is "well-accepted law in Kentucky" that IIED claims are preempted by the KCRA when the basis of the IIED claim is the same as the basis for the claim under the act.  <u>Webb</u>, 819 F.Supp.2d at 651 (citations omitted); <u>McDonald's Corp. v.</u>

Ogborn, 309 S.W.3d 274, 286 (Ky. Ct. App. 2009).  Because Gott offers no separate basis for his

common law IIED claim, the undersigned grants summary judgment in favor of Sun Products.[12]


ORDER

**IT IS HEREBY ORDERED** that Sun Products' Motion for Summary Judgment (DN

27-1) is **GRANTED** as to all claims.


Copies:        Counsel


---

12 Gott requested punitive damages in his Complaint (DN 1-1, at p.4), but because the undersigned is granting summary judgment in favor of Sun Products as to all claims, the Court need not address this issue.